UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HAROLD D. GRIFFIN,

                         Plaintiff,                    6:10-CV-627

  vs.

                                                     (NAM/DEP)

VILLAGE OF FRANKFORT and STEVEN
CONLEY,

                         Defendants.
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| Office of Mark A. Wolber<br>239 Genesee Street<br>Utica, New York 13501<br>*Attorney for Plaintiff* | Mark A. Wolber, Esq. |
| Barth, Sullivan Law Firm<br>224 Harrison Street<br>Syracuse, New York 13202<br>*Attorneys for Defendants* | David H. Walsh, IV, Esq. |

**Norman A. Mordue, U.S. District Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

     The present case is one arising under the auspices of 42 U.S.C. § 1983. This is the second lawsuit plaintiff has brought against these defendants in this Court. The first involved a physical altercation in June 2008 that occurred after an election involving Village officials. In that case, plaintiff was involved in a brawl with defendant Conley who is the Police Chief of the defendant Village, the Mayor of the Village of Frankfort and other Village officials. He sued these defendants and the Village itself pursuant to 42 U.S.C. § 1983 alleging violation of his federal

and constitutional rights. By Memorandum-Decision and Order dated January 24, 2012, this Court granted summary judgment to the defendant Village but denied summary judgment to defendant Conley. In this case, plaintiff alleges that Conley threatened and assaulted him while he was at a convenience store buying coffee. Plaintiff also asserts that he was placed under false arrest. Defendants move for summary judgment dismissing the complaint. Plaintiff opposes defendants' motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

On May 20, 2009, plaintiff, Harold Griffin, left his home at approximately 3:00 p.m. to go to Stewarts Shops in Frankfort, New York to get a cup of coffee. Plaintiff and defendant Conley both arrived at Stewarts at approximately the same time. According to plaintiff, he opened the door to enter the shop and observed Conley standing to his left behind the glass door. Plaintiff said that he then said "Go ahead sir," and held the door for Conley while Conley walked around his back into the store. Conley testified that as he was walking toward the door of the shop, plaintiff walked very fast to get there before him and as he opened the door with both hands, he "flung it back" at Conley and "tried to hit" Conley with it. Conley said that plaintiff flung the door so hard that he had to move out of the way and as he backed away the door hit the building and "shot back" at plaintiff "he had to catch it with both of his hands."

Plaintiff said he then walked into the shop behind defendant Conley and both men walked straight to the coffee counter where there were four or five coffee pots. According to plaintiff, while the men where standing side by side attending to or pouring their coffee, defendant Conley said to plaintiff in a normal tone of voice that when he was "off duty," they were "going to get together." In response to this comment, plaintiff told Conley that if he had something to say, he

2

should "say it loud enough so everybody in the store could hear him." Plaintiff stated that Conley replied that he had "not threaten[ed]" him. Plaintiff said he announced in the shop "I didn't say you did threaten me. I said, be a man and repeat what you said to me so everybody in the store can hear you." Plaintiff asserted that he then paid for his coffee and attempted to leave the store but Conley blocked him from exiting and told him he was under arrest. Plaintiff denied that he used any vulgarities or foul language up to this point in his confrontation with defendant Conley.

According to Conley, he saw plaintiff approach him with "his fist clenched" while he was fixing his coffee and he thought plaintiff was going to attack him. Conley said he asked plaintiff what "his problem" was. Conley testified that plaintiff immediately started yelling "Did you hear that? Did you hear that? He threatened me." Conley said plaintiff was "screaming at the top of his lungs to all the patrons and everybody that was in the store." Conley stated that he told plaintiff "Harold, I didn't threaten you. All I asked you is what your problem is. You tried to hit me with the door." Conley said plaintiff said "Fuck you" a "couple of times" and "go fuck yourself." Conley said he told plaintiff to back away and stop using vulgar and profane language in front of the other patrons or he was going to be arrested for disorderly conduct. One of the other patrons in the store yelled "Give him hell Harold." Although Conley said that plaintiff did back away from him, he did not stop swearing.

It is undisputed between the parties that on May 20, 2009, at approximately 3:00 p.m. there were other patrons in Stewarts, including Barbara Hight, Jimmy Juliano and employee, Kristie Rabbitt. Plaintiff also testified that at the time of the incident there were "a lot"of children in the shop although another witness recalled only seeing "two little girls." In response to defendant Conley telling plaintiff he was under arrest, plaintiff responded by swearing. Plaintiff

3

acknowledged he was "sure" he used "the 'F' word," and told Conley he was not going with him. Indeed, plaintiff said he told Conley that he would "go with any cop in Herkimer County, but [he] was not walking out of Stewart's with [Conley.]"  Thereafter, however, plaintiff told Conley that he would wait for the state police when asked to leave the store with Conley.

According to plaintiff, Conley then went outside and made a telephone call but blocked the door so that plaintiff could not leave the store.  Plaintiff said that occasionally while Conley was outside, he would open the door and tell plaintiff to come outside because he was under arrest and plaintiff would tell him he was waiting for the state police.  Plaintiff acknowledges using vulgarities in responding to Conley during these exchanges.  Plaintiff called his boss and his wife. Plaintiff's wife arrived at the shop just moments later along with another Village police officer named Ameduri who "bumped" plaintiff with his chest and told him he was "fucking under arrest."  Plaintiff told him to "turn [his] ass around and walk right back out that door because [he's] waiting for the state police."  Plaintiff said that Ameduri then left the shop.

Moments later, both Conley and Ameduri came back in the store.  Plaintiff said that Conley told him to put his coffee down but he refused to do so because he said he was not going to be arrested by Conley.  Plaintiff said he was holding his coffee cup with both hands and the palm of one hand over the top of the cup.  According to plaintiff, defendant Conley reached in, grabbed the top of his hand, squeezed his hand and his coffee went everywhere.  Conley then directed Ameduri to pepper spray plaintiff.  Ameduri then pepper sprayed plaintiff in his face, neck and shoulder area.  Plaintiff believes he was pepper sprayed for about 20 seconds and alleges that Ameduri acted like a "wild man" with the pepper spray.  To wit, plaintiff avers that at one point when he bent over the counter of store to avoid being sprayed, Ameduri ran from in

4

front of the counter to behind it to continue spraying him. Plaintiff asserts that Ameduri did not stop spraying him until defendant Conley told him to stop. After the pepper spraying ceased, plaintiff said that both Conley and Ameduri left the shop.

Defendant Conley and Officer Ameduri recalled this part of incident differently. Accordingly to Conley, he and Ameduri entered the store to place plaintiff under arrest. Conley directed plaintiff to put his coffee down a couple of times and he refused. Finally, Conley said he reached for the coffee and plaintiff threw it on his left leg. Conley said he knocked the rest of the coffee out of plaintiff's hand and attempted to place him in hand restraints, but plaintiff started elbowing him. Officer Ameduri told plaintiff to stop resisting, but he continued to "flail his arms and elbow [the officers] as they were trying to put the handcuffs on him." Conley said he then instructed Ameduri to pepper spray plaintiff.

Moments later, they returned and they parties continued exchanging vulgar language until a Town of Franklin Police Officer named Hajec arrived at the store. After speaking with the officers and plaintiff, Hajec told plaintiff that he was going to take him into custody. Plaintiff agreed as long as he would not be handcuffed and left alone with Conley and Ameduri. Hajec arrested plaintiff and turned him over to the state police. Plaintiff was charged with Harassment in the Second Degree, Disorderly Conduct and Resisting Arrest. The Court notes that in his deposition testimony, Officer Ameduri testified that he was out on disability from the Village of Frankfort Police Department because he alleges that was "assaulted" by defendant Conley. Officer Ameduri attributes this assault to the fact that Conley did not want to acknowledge that he ordered Ameduri to take certain statements out of his supporting arrest deposition of plaintiff. Specifically, Ameduri said that Conley ordered him to take out the statement "Sam, pepper spray

5

him" out of the deposition to make it appear that pepper spray was used to control the subject, not at Conley's direction. Ameduri also testified that within minutes of completing his deposition he asked Conley why plaintiff had been so upset and acting out. According to Ameduri, Conley said "Because I got him going . . . I whispered in his ear at the coffee station . . . when I'm off duty, me and you are gonna go."

III.     DISCUSSION

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

A.     Plaintiff's Claim Against Village of Frankfort

Title 42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

Under the standards of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality. *Id.* at 690–91; *see also*

*Connick v. Thompson*, ––– U.S. ––––, 131 S.Ct. 1350, 1359 (2011) (municipalities can be held liable for "practices so persistent and widespread as to practically have the force of law"). "Where a city's official policy is constitutional, but the city causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy, the city may be held liable for its employees' unconstitutional acts." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004). The Court of Appeals in *Amnesty America* went on to explain that "[s]uch circumstances may be found, for example, where the city is aware that its policy may be unconstitutionally applied by inadequately trained employees but the city consciously chooses not to train them, or where the city's official policy on the reasonable use of force in arrests is valid, but the city's actual practice is to use excessive force." 361 F.3d at 125–26 (citations omitted).

The Court agrees with the plaintiffs' contention that the complaint succeeds in stating a claim under 42 U.S.C. § 1983 against the Village of Frankfort on the basis of custom and policy, as a result of alleged decisions made by defendant Conley, the Police Chief of the Village who is alleged to have violated directly plaintiff's constitutional rights and ordered other officers to do so. *See Johns v. Town of East Hampton,* 942 F. Supp. 99, 106 (E.D.N.Y. 1996) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84 (1986) (A single decision by a municipal policymaker can subject a municipality to liability under 42 U.S.C. § 1983))); *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980). It is well settled that under New York law, Village Police Departments are established by boards of trustees who may appoint a chief of police or other personnel as needed. N.Y. Vill. Law § 8-800. Under this provision, boards of trustees also have the power to discipline police personnel. *See id.* In this case, however, plaintiff alleges that the Chief of Police was the

7

active wrongdoer in his unconstitutional arrest. Though not argued by plaintiff in his moving papers, the Court notes that review of the record reveals defendant Conley was undoubtedly a final policy maker for the Village of Frankfort Police Department. While he denied at his deposition having actually **written** any police policies during his tenure as Chief and only acknowledged that he was responsible for enforcing the policies of his predecessor, he also testified that no Village official including the Mayor and members of the Town Board gave him instructions or criticism concerning his operation of the Police Department. Thus, the record certainly demonstrates or suggests that Conley has final policy-making authority in the Village, at least insofar as police matters go. Where a municipal official " 'has final authority over significant matters involving the exercise of discretion,' his choices represent government policy." *Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) (quoting *Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir.1983)); *see also Diodati v. City of Little Falls*, No. 6:04–CV–446 (FJS/DEP), 2007 WL 189130, at *2, (N.D.N.Y. Jan. 18, 2007) ("A policymaker is an individual whose 'decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions.' " (quoting *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir.2003))). Moreover, "the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the [municipality's] business." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (quotation marks omitted) (emphasis in original). "Thus, the court must ask whether [the] governmental official [is a] final policymaker[ ] for the local government in a particular area, or on [the] particular issue involved in the action." *Id.* at 57 (quotation marks omitted); *see also Doe v. City of Waterbury*, 453 F.Supp.2d 537, 543 (D.Conn. 2006) ("The

8

critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." (emphasis in original)).

Crediting plaintiff's allegations, defendant Conley antagonized and/or threatened him with the intention of upsetting him, then threatened to arrest him which upset plaintiff even more. Plaintiff asserts that Conley's actions arise from retaliatory animus arising from plaintiff having sued Conley in the prior action before this Court. According to plaintiff, the entire incident was caused by defendant's Conley's initial threat followed by Conley's baseless and unreasonable threats to arrest plaintiff over an incident which he perpetuated. Viewing the evidence presented by plaintiff in the light most favorable to him, the Court finds that a jury may find that defendant Conley provoked the entire incident at Stewart's and that there was no justification for his decision to arrest plaintiff for Disorderly Conduct. Conley's provocation of plaintiff and subsequent decision to arrest him for Disorderly Conduct orders was allegedly an unlawful application of the Village's otherwise lawful police policy and /or Conley's own unlawful policy which he decided to apply specifically to plaintiff. In either event, Conley's actions and subsequent orders to Ameduri to arrest plaintiff and use pepper spray on him constitute allegedly unlawful application of police policy and may be attributed to the Village given Conley's position as Chief.

B.      False Arrest

Under New York and federal law, "probable cause serves as a complete defense to the charges of false arrest and malicious prosecution." *See Zanghi v. Inc. Vill. of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985). "Probable cause is established when the arresting officer has

9

knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer v. Fulton County Sheriff*, 63 F. 3d 110, 119 (2d Cir. 1995); *accord Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). In evaluating probable cause, courts consider the facts available to the officer at the time of the arrest. *Martinez v. Simonetti*, 202 F. 3d 625, 634 (2d Cir. 2000); *Lowth v. Town of Cheektowaga*, 82 F. 3d 563, 569 (2d Cir. 1996); *see also Broughton v. State of New York*, 37 N.Y.2d 451, 458 (1975).

In this case, plaintiff was arrested for Harassment in the Second Degree, Disorderly Conduct and Resisting Arrest. The initial incident began, however, when Conley decided to arrest plaintiff for being loud and using profane language in the coffee shop in front of other patrons in connection with a personal verbal altercation with him. According to N.Y. Penal Law § 240.20:

> A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
>
> . . .
>
> (2) He makes unreasonable noise; or
>
> (3) In a public place, he uses abusive or obscene language, . . .

While it is uncontroverted that plaintiff was being loud and swearing after defendant Conley threatened to arrest him, plaintiff denies that he yelled or used any obscene language before Conley said he was going to place him under arrest. There are clearly questions of fact in the record concerning how the initial decision to arrest plaintiff came about. Without probable cause to arrest plaintiff for disorderly conduct in the first instance, defendant Conley lacked cause to arrest him for the conduct that followed. See Joyner-El v. Giammarella, No. 09-CIV-3731(NRB),

2010 WL 165957, *5 (S.D.N.Y. April 15, 2010) (plaintiff's claim that his initial arrest prior to events which led to him attempting to possess a gun lacked probable cause raised questions of fact for trial). A jury will have to decide if it is more likely that things happened as recalled by plaintiff - that is, that he was provoked and threatened by Conley which led to the escalation of tensions, or that plaintiff tried to hit Conley with the door, acted aggressive from the outset of their interaction with each other and simply blew up in a fit of loud anger and expletives when Conley asked him what his problem was.

C. Assault and Battery

As has been discussed at length above in connection with plaintiff's other claims, there are stark questions of fact in the record concerning how the incident at issue occurred. Whether defendant Conley's actions in pepper spraying plaintiff were justified as inherent to a lawful arrest or were an unlawful assault and battery must be left to a jury.

IV. CONCLUSION

Based on the foregoing, it is hereby

ORDERED that defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.

Date:   September 28, 2012

*/s/ Norman A. Mordue*
Honorable Norman A. Mordue
U.S. District Judge